

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

August 25, 1951

Hon. Allan Shivers
Governor of Texas
Austin, Texas

Opinion No. V-1254

Re: Validity of "riders" in H.B.
426, Acts 52nd Legislature,
1951, the general appropria-
tion bill for the biennium
ending August 31, 1953.

Dear Governor Shivers:

     In your original request for an opinion you asked that we study the legality and constitutionality of the riders in House Bill 426, Acts 52nd Leg., R.S., 1951, and advise you as to our conclusions as early as possible. In subsequent conferences you indicated that you are primarily interested in securing the rules of law applicable in determining the legality or constitutionality of riders in an appropriation bill. You stated that in view of the holding in Fulmore v. Lane, 104 Tex. 499, 140 S.W. 405 (1911) and Attorney General's Opinion No. V-1196 (1951) that the Governor has no authority to veto a non-appropriating rider in an appropriation bill, you are particularly concerned about the growing tendency toward "government by riders" and desire a general statement of the rules of law applicable to riders rather than a specific ruling on each separate rider. With this in mind, we shall present the general rules and refer to specific riders only by way of illustration as to how the general rules are applied.

     Generally speaking, the constitutional provision limiting the scope of riders in general appropriation bills and the power of the Legislature with regard thereto is Section 35 of Article III of the Texas Constitution. In addition, Section 1 of Article II is sometimes applicable.

     The history of Section 35 of Article III and discussions by contemporary jurists give an insight into the evils which were intended to be corrected by its adoption. Section 35 provides:

     "No bill, (except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which moneys are appropriated) shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in

**158**

the title, such act shall be void only as to so much thereof, as shall not be so expressed."

A similar provision originally appeared in Section 24 of Article VII of the Texas Constitution of 1845 as follows:

"Every law enacted by the Legislature shall embrace but one object, and that shall be expressed in the title."

This was the first time in Texas history that an attempt was made to control the title and inclusiveness of legislation. The Constitutions of 1861, 1866, and 1869 carried forward the wording without change.

In discussing the background of the Texas provision Chief Justice O. M. Roberts, a member of the 1866 Convention and a contemporary of this period, said:

"This provision in the Constitution originated in, and was adopted to prevent the repetition of a most flagrant abuse of legislative power in the State of Georgia in the last century. Its history is briefly sketched in an opinion delivered in the Supreme Court of that State, as follows, to wit: 'As to the objection that the act of 1841 is violative of the 17th sec. 1st art. of the Constitution of Georgia, because its title is at variance with the body of the act, I would observe that the traditionary history of this clause is, that it was inserted in the Constitution of 1798, at the instance of General James Jackson, and that its necessity was suggested by the Yazoo act. That memorable measure of the 17th of January, 1795, as is well known, was smuggled through the Legislature under the caption of an act, "for the payment of the late State troops," and a declaration in its title of the right of the State to the unappropriated territory thereof, "for the protection and support of its frontier settlements."' (Mayor and Alderman of Savannah v. The State of Georgia, 4 Ga., 38.) This obnoxious act was repealed the next year, and the large grant of land to private individuals embraced in it declared null and void for fraud in its enactment. This act became still more notoriously memorable by its subject-matter being litigated, and its history being developed in the report of the leading case of Fletcher v. Peck, decided by the Supreme Court of the United States in 1810. (6 Cranch, U.S., 87.)

"Hence this provision limiting the legislative power, has been adopted in many if not most of the Constitutions of the different States of the Union. . . ." Giddings v. San Antonio, 47 Tex. 548, 555, 556 (1877).[1]

In 1851 the Texas Supreme Court, in an opinion by Chief Justice Hemphill, held that Section 24 of Article VII was mandatory, not merely directory.[2]

The evils to be avoided by this constitutional limitation have been discussed in numerous cases. Typical of these discussions is the following from Stone v. Brown, 54 Tex. 330 (1881) at 342, in which the Supreme Court of Texas said:

"The principal object of this constitutional provision is to advise the legislature and the people of the nature of each particular bill, so as to prevent the insertion of obnoxious clauses, which otherwise might be engrafted thereupon and become the law; and also to prevent combinations, whereby would be concentrated the votes of the friends of different measures, none of which could pass singly; thus causing each bill to stand on its own merits.[3]

In Cooley's Constitutional Limitations (8th Ed. 1927) 295, the purpose of the constitutional provision is summarized as follows:

". . . It may therefore be assumed as settled that the purpose of these provisions was: first, to prevent hodge-podge or 'log-rolling' legislation; second, to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles

---

[1] Georgia was the first State to place this type of limitation in its constitution. There are now 41 States that have provisions of this general nature. Only Connecticut, Maine, Massachusetts, New Hampshire, North Carolina, Rhode Island and Vermont are without it. Constitutional Limitations upon Statute Titles in Louisiana, 6 La. L.R. 72, 78 (Comment 1944).

[2] Cannon v. Hemphill, 7 Tex. 184 (1851).

[3] Similar statements are found in the general treatises of Freund, Standards of American Legislation, 155, 156; 1 Sutherland Statutory Construction (3rd Ed. 1943) 287, Sec. 1702; 1 Cooley's Constitutional Limitations (8th Ed. 1927) 294, 295, 296.

gave no intimation, and which might therefore be over-
looked and carelessly and unintentionally adopted;
and, third, to fairly apprise the people, through such
publication of legislative proceedings as is usually
made, of the subjects of legislation that are being
considered, in order that they may have opportunity
of being heard thereon, by petition or otherwise, if
they shall so desire."

In 1 Sutherland, Statutory Construction (3rd Ed. 1943)
290, it is stated:

". . . It prevents the surreptitious passage of
laws containing provisions incongrous with the subject
proclaimed in the title. It militates against 'omnibus,'
or multi-subject legislation, the practise of procuring
diverse and unrelated matters to be passed as one act
through the consolidated vote of the advocates of each
separate measure, when perhaps no single measure could
have been passed on its own merits. It also prevents
the attachment of undesirable 'riders' upon bills cer-
tain to be passed because of their public popularity
or desirability." (Emphasis added throughout.)

The last sentence above quoted from Sutherland is
particularly applicable to general appropriation bills. It
is certain that they are desirable and in fact necessary legis-
lation. As a usual thing, this type of bill comes up for con-
sideration late in the session and must be passed. Even permis-
sible and appropriate riders are often attached in conference
committee, and the entire bill is submitted to the House and the
Senate on a "take or leave it" vote. In such instances, there
is no opportunity for public notice, full discussion, amendment,
or elimination of a particular rider. Legislators are called
upon to vote for the entire bill as drafted by the conference
committee or vote against the entire bill.

In the same manner, the entire general appropriation
bill is submitted to the Governor. He can veto appropriation
items and riders, but he does not have the power to veto non-
appropriating riders. Attorney General's Opinion No. V-1196
(1951). If an objectionable matter of general legislation is
contained in a non-appropriating rider, the Governor must never-
theless accept it or else veto the entire general appropriation
act. This he can seldom afford to do.

The constitutional limitation now under consideration
was aimed at preventing such situations. This was stated by the

Supreme Court of Pennsylvania, a State which has a similar con-
stitutional provision, in Commonwealth v. Barnett, 199 Pa. 161,
48 Atl. 976 (1901), as follows:

> ". . . by joining a number of different subjects in
> one bill the governor was put under compulsion to ac-
> cept some enactments that he could not approve, or to
> defeat the whole, including others that he thought
> desirable or even necessary. Such bills, popularly
> called 'omnibus bills,' became a crying evil, not only
> from the confusion and distraction of the legislative
> mind by the jumbling together of incongrous subjects,
> but still more by the facility they afforded to cor-
> rupt combinations of minorities with different inter-
> ests to force the passage of bills with provisions
> which could never succeed if they stood on their sepa-
> rate merits. So common was this practice that it got
> a popular name, universally understood, as 'logrolling.'
> A still more objectionable practice grew up, of putting
> what is known as a 'rider' (that is, a new and unrelated
> enactment or provision) on the appropriation bills, and
> thus coercing the executive to approve obnoxious legis-
> lation, or bring the wheels of the government to a stop
> for want of funds. These were some of the evils which
> the later changes in the constitution were intended to
> remedy. . . ."

Again with specific reference to the reason for this
type of constitutional limitation in the case of appropriation
bills, the Supreme Court of Oregon said:

> "The evident purpose of this provision was to
> prevent matters foreign to the general purpose of ap-
> propriation bills being attached to them as riders,
> thereby taking advantage of the necessity of the state
> for money to defray its current expenses and to pay
> its officers to pass measures that perhaps would other-
> wise have been defeated." Evanhoff v. State Industrial
> Accident Commission, 154 Pac. 106, 111 (1915).

Three changes were made in the wording of this Article
in the Constitution of 1876. The provision was moved from the
General Provisions section of the Constitution to the Legisla-
tive Section where it became Section 35 of Article III, with the
wording it has today. It is quoted in full on page 1 of this
opinion. The reasons for the three changes are readily apparent.
The exception made for appropriation bills was to insure that no
court would hold the appropriation for each subject or account

a separate general subject and as a result require a multiplicity of appropriation bills; and the saving clause was added to prevent the striking down of the whole of the Act. The other basic change, from the use of the word "object" to "subject," has been explained as being an attempt to make the whole provision less restrictive.[4] The general purpose and object of the constitutional provision remained the same.

In dealing with Section 35 of Article III, a rule of liberal interpretation has always been applied. The tendency of the decisions is to construe the constitutional provisions on this subject liberally rather than to embarrass legislation by a construction whose strictness is unnecessary to the accomplishment of the beneficial purpose for which it was adopted.[5] But at the same time the Court has been careful to point out, as was originally done by Chief Justice Hemphill in Cannon v. Hemphill, 7 Tex. 184, 208 (1851), that this provision cannot be ignored and thus nullified.

With reference to general appropriation bills, the Supreme Court of Texas has held that "the appropriating of funds to be paid from the State Treasury is a 'subject' within the meaning of Article III, Section 35, of our Constitution."[6] It is clear from the terms of the constitutional provision that general appropriation bills may contain more than one subject of this same nature, i.e., appropriations for the various departments and accounts. The exception of general appropriation bills from the constitutional prohibition against bills containing more than one subject is a limited and restricted exception. The exact wording is

". . . except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which moneys are to be appropriated . . ."

As long as a general appropriation bill includes only subjects of appropriating money and limiting the use thereof in harmony with general legislation, it may relate to any number of

---

4/ Stone v. Brown, 54 Tex. 330, 341 (1881), and Travelers Protective Association of America v. Ziegler, 250 S.W. 1115, 1118, (Tex. Civ. App. 1923, error ref.).

5/ Giddings v. San Antonio, 47 Tex. 548 (1877); Dellinger v. State, 28 S.W.2d 537 (Tex. Crim. App. 1930).

6/ Moore v. Sheppard, 144 Tex. 537, 192 S.W.2d 559 (1946).

different "subjects and accounts." In such instances all of the subjects are under the one general object and purpose of appropriating funds from the treasury. The obvious purpose of this limited exception was to make certain that appropriations to more than one department in the same bill would not be prohibited. In all other respects general appropriation bills are subject to the same prohibition as all other bills against containing more than one subject. The result is that general legislation cannot be embodied within a general appropriation bill. Moore v. Sheppard, supra.

A general appropriation bill may be defined as a single bill which appropriates funds for two or more departments, subjects, accounts, or purposes. It has the one general purpose or subject matter of appropriating money.[7]

General legislation does more than appropriate money and limit its expenditure. As said by a former Attorney General in Opinion No. 2965 (1935),

". . . if the Bill does more than set aside a sum of money, provide the means of its distribution, and to whom it shall be distributed, then it is a general law . . ."

Thus, the distinction between general appropriation bills and general legislation has been recognized in this State in the simple fact that the former merely sets apart sums of money for specific objects and uses while the latter does more than merely appropriate and limit the use of funds. General legislation constitutes a separate subject and cannot be included within a general appropriation bill. Moore v. Sheppard, supra; Att'y Gen. Op. 2965, supra.

This does not mean that general legislation may not contain an appropriation which is merely incidental to and necessary to carry out the subject and purpose of the general law.

---

7/ The Arizona Supreme Court has said: "The general appropriation bill is not in the true sense of the term legislation, it is, as the language implies, merely a setting apart of the funds necessary for the use and maintenance of the various departments of the state government already in existence and functioning." Sellers v. Frohmiller, 24 P.2d 666, 669 (Ariz. Sup. 1933). The Nevada Supreme Court has said: "These appropriation bills, as indicated by the titles, are passed for support of the state government, and are not legislative acts changing the substantive or general laws. . . ." State v. Eggers, 136 Pac. 100, 101 (Nev. Sup. 1913).

Attorney General's Opinion No. 2965, supra. Neither does it mean that a general appropriation bill may not contain general provisions and details limiting and restricting the use of the funds therein appropriated, if such provisions are necessarily connected with and incidental to the appropriation and use of the funds and if they do not conflict with or amount to general legislation. Conley v. Daughters of the Republic, 106 Tex. 80, 156 S.W. 197 (1913).

The general rule with reference to all bills was stated by the Supreme Court of Texas in Phillips v. Daniel, 94 S.W.2d 1193, 1197 (Tex. Civ. App. 1936, error ref.), as follows:

"The law is settled that under the Constitutional provision referred to /Article III, Section 35/ any number of provisions may be contained in the same bill or act, however diverse they may be; the only requirement being that they are consistent with the general object or subject, and have a mutual relation and connection, directly or indirectly, with the general subject or object of the act or bill."

With special regard to what incidental provisions may be included within a general appropriation bill, our Texas courts have not stated a general rule. However, from statements as to what may not be included and from numerous opinions of the Attorney General, we believe the rule may be stated generally as follows: In addition to appropriating money and stipulating the amount, manner, and purpose of the various items of expenditure, a general appropriation bill may contain any provisions or riders which detail, limit, or restrict the use of the funds or otherwise insure that the money is spent for the required activity for which it is therein appropriated, if the provisions or riders are necessarily connected with and incidental to the appropriation and use of the funds, and provided they do not conflict with general legislation.[8]

---

[8] Attorney General's Opinion No. 2965 (1935) says that we should be governed by the ordinarily accepted meaning of "Appropriation Bill" and quotes as accepted definitions the following:

"'A setting apart from the public revenue of a certain sum of money for a specific object in such a manner that the executive officers of the government are authorized to use that money and no more for that object and for no other.' C.J. Vol. 4, page 1460.

"Webster defines an appropriation bill as follows:

"'A measure before a legislative body authorizing the expenditure of public moneys and stipulating the amount, manner, and purpose of the various items of expenditures.'"

In support of this general statement of the rule we call your attention to the case of <u>Linden v. Finley</u>, 92 Tex. 451, 49 S.W. 578 (1899), in which the Supreme Court of Texas said: "There is nothing in the Constitution which prohibits the Legislature from limiting any appropriation by any apt words expressive of their intent." Also, in <u>Conley v. Daughters of the Republic</u>, 106 Tex. 80, 156 S.W. 197 (1913), the Court upheld a provision in a general appropriation bill which required that funds appropriated therein for improvement of the Alamo property were to be expended upon approval of the Governor. The Court said:

> "It cannot be that a separate and independent law would be necessary to direct and control the expenditure of every item of appropriation."

Courts of several other States with similar constitutional provisions have applied this general rule. A rider that limited expenses for transportation, lodging and subsistence to a $5 per day maximum was held valid in New Mexico. The Supreme Court of that State said, "The details of spending the money so appropriated, which are necessarily connected with and . . . incidental . . . do not violate the Constitution if incorporated in such general appropriation bill." <u>Whittier v. Safford</u>, 214 Pac. 759 (N. Mex. Sup. 1923). The Mississippi Supreme Court has said: "The legislature can provide in bills making appropriations for the expenditure of the money, and the conditions on which it may be drawn from the treasury, and for the administration of the fund so long as the machinery created is limited to the appropriation so made." <u>Trotter v. Gates & Co.</u>, 139 So. 843, 846 (Miss. Sup. 1932). The Supreme Court of Montana, in holding that a rider in an appropriation bill changing the method of payment out of a designated fund is valid, said, ". . . so long as incidental provisions of an appropriation bill are germane to the purpose of the appropriation it does not conflict with any Constitutional provision. . . . What valid objection can be interposed to such a course, so long as the Legislature confines the incidental provisions to the main fact of the appropriation, and does not attempt to incorporate in such act general legislation, not necessarily or directly connected with the appropriation legally made, under the restrictions of the section in question?" <u>Davidson v. Ford</u>, 141 P.2d 373, 377 (Mont. Sup. 1943).[9]

---

9/ Only the State of Florida, where the Constitution provides that the appropriation bill shall contain nothing but appropriations, holds that any rider which in fact does not appropriate money is invalid. Lee v. Dowda, 19 So.2d 570 (Fla. Sup. 1944).

This interpretation of the rule applicable to riders in a general appropriation bill under Section 35 of Article III has been followed by the Texas Legislature for many years. It has continuously provided for accounting procedures in connection with the funds appropriated, limited the use of contingent expense appropriations, set the rates for travel expense to be paid from the funds to State employees, specified the time of payment of salaries appropriated, and prohibited use of appropriated funds for payment of salaries to "any employee who uses alcoholic beverages while on active duty" or who engages in certain political activities. Riders of this nature in the general appropriation bill are constitutional, because they merely detail, limit, or restrict the use of the funds appropriated or otherwise insure that the money will be used for the purposes intended. Even the riders prohibiting payment of salaries to those who consume alcoholic beverages while on duty or who engage in political activities are legitimate means of insuring that the purpose of the appropriation will not be defeated and the money wasted on employees who carry on unauthorized activities during the time for which they are being paid to attend to the State's business. In the Texas Legislative Manual (1949), page 263, this type of provision is referred to as "a condition attached to an appropriation, upon failure to comply with which the appropriation will cease to be effective." See also page 224.

Appropriation bill riders which violate Section 35 of Article III have been more frequently discussed by the courts and the Attorney General than those which are properly within the scope of such bills. The majority of the riders which have been stricken are those which attempt to modify or amend a general statute. It is well settled in this State that a rider attached to a general appropriation bill cannot repeal, modify or amend an existing general law. State v. Steele, 57 Tex. 203 (1882); Linden v. Finley, 92 Tex. 451, 49 S.W. 578 (1899); Attorney General's Opinions No. 1745 (1917), 2787 (1929), 2965 (1935), 2970 (1935), O-445 (1939), O-1837 (1940), O-2573 (1940), O-5329 (1943), V-412 (1947), and V-894 (1949).

In State v. Steele, supra, Linden v. Finley, supra, and Attorney General's Opinions 1745, 2787, 2965, supra, it was held that general statutes fixing salaries or fees could not be amended by a general appropriation bill. Riders providing for use or transfer of special funds contrary to general statutes which provided for a different deposit or use were held unconstitutional by Attorney General's Opinions 2970 (1935), O-5329 (1943), and V-412 (1947). A rider requiring three years residence in Texas before being admitted to the State Tuberculosis Sanatorium when

the general statute required only citizenship in Texas was held invalid in Attorney General's Opinion O-2573 (1940).

General legislation attempted in a general appropriation bill, even though not designed to modify or amend an existing statute, was condemned by the Supreme Court of Texas in Moore v. Sheppard, supra. In that case the Legislature had provided by rider in the appropriation bill that the Clerks of the Courts of Civil Appeals should deposit all unofficial fees collected by them in the State Treasury and that they should not be paid their salaries until and unless they filed an affidavit showing compliance therewith. Moore refused to comply and brought suit to require payment of his salary. The Court rendered judgment in his favor upon the grounds that the rider attempted to fix fees of office and that this was a subject of general legislation separate and apart from appropriating money and therefore unconstitutional. The Court said:

"That the fixing of official fees is a matter of general legislation, and is a 'subject' of general legislation within the meaning of Article III, Section 35, above, cannot be questioned. . . .

". . . that portion of the Appropriation Bill setting out for the first time matters not germane thereto, and dealing with general legislation on the different and wholly unrelated 'subject' of fees charged by petitioners for unofficial copies, and prescribing the disposition of such fees, is in conflict with the mandate of Article III, Section 35, and is unconstitutional. . . ."

A similar ruling was made by the Attorney General of Texas in Opinion O-445 (1939) written by former Associate Justice James P. Hart concerning a rider which prohibited State employees from accepting or using passes issued by transportation agencies. In this opinion it was said:

"The anti-pass provisions of the appropriation bill do not constitute a regulation of the manner in which the sums appropriated therein shall be expended. If construed as an implied amendment of the general statutes prohibiting the issuance of free passes by transportation agencies, said provisions would be invalid since a general law may not be amended by provisions of a general appropriation bill. See State v. Steele, 57 Tex. 200; Linden v. Finley, 92 Tex. 451."[10]

---

[10] This rider was also held unconstitutional because it was not covered by the caption of the act.

**168**

Examples of valid and invalid riders in House Bill 426, the general appropriation bill for the biennium ending August 31, 1953, may be found in Subdivision (15) of Section 2, Article III, relating to State-owned automobiles. The valid rider provides:

". . . No motor-propelled passenger-carrying vehicle may be purchased with any of the funds appropriated in this Article, . . ."

This is a constitutional rider because it does no more than limit and restrict use of the funds appropriated by House Bill 426.

The invalid rider reads as follows:

"All State-owned motor-propelled passenger-carrying vehicles under the control of any department, commission, board, or other State agency are hereby declared to be no longer needed. Such motor-propelled passenger-carrying vehicles shall be sold in compliance with and as provided for in Article 666, Revised Civil Statutes of Texas, as amended, or otherwise as provided by law, not later than October 1, 1951. . . . provided, however, that these provisions of this Section in regard to the sale and purchase of motor-propelled passenger-carrying vehicles shall not apply to the Executive Department, State Highway Department, Department of Pulbic Safety, Game, Fish and Oyster Commission, and the Railroad Commission, provided that the Railroad Commission shall only keep and have in its possession not to exceed twenty (20) motor-propelled passenger-carrying vehicles and the Texas Prison System shall only keep and have in its possession those vehicles equipped with two-way radios. Notices shall be given in writing to persons now using said vehicles of the time and place they are going to be sold in order that such persons may have an opportunity to bid on said motor-propelled passenger-carrying vehicles."

The foregoing rider is not incidental to the appropriation of money or a limitation or restriction of the use of money appropriated by House Bill 426. It relates to an entirely different subject and is general legislation prohibited by Section 35 of Article III of the Constitution. Attorney General's Opinion No. V-1253 (1951). This rider illustrates the reason for the constitutional prohibition against general legislation in an appropriation bill. As pointed out in the above opinion, if this type of legislation were valid, it would be possible for the Legislature to provide for the sale of the State's office buildings or the public

school lands in a general appropriation bill. Clearly, the sale of State-owned automobiles and other property, in the words of the Supreme Court in Moore v. Sheppard, supra, is on a "different and wholly unrelated subject" from appropriating funds. This rider is also unconstitutional because the caption of the bill gives no notice whatever of its presence in the bill. Attorney General's Opinion V-1253 (1951).

As previously pointed out, riders in an appropriation bill may sometimes conflict with Section 1 of Article II of the Texas Constitution, which provides:

"The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

The Legislative Budget Board, composed of the Speaker and four House members appointed by him (including Chairman of the Appropriations Committee and Chairman of Revenue and Taxation Committee) and the Lieutenant Governor and four Senate members appointed by him (including Chairman of Finance Committee and Chairman of State Affairs Committee) was created by Senate Bill 387, Acts 51st Leg., R.S., 1949, ch. 487, p. 908 (Art. 5429c, V.C.S.) to serve in an investigatory and advisory capacity with respect to proposed appropriations. The Board's functions are supplementary to those of the Board of Control and the Governor, as already prescribed in Articles 689a-1 through 689a-7, V.C.S. Article 689a was amended by Senate Bill 413, Acts 52nd Leg., R.S., 1951, ch. 332, p. 572.

There is no constitutional question involved in the creation of such an advisory legislative budget committee.[11] But the same Legislature, in a rider to its general appropriation bill for the Board for Texas State Hospitals and Special Schools, went further in subjecting the expenditure of transferred funds and unexpended balances by the Texas State Board for Hospitals and Special Schools to the approval of the

---

[11] Terrell v. King, 118 Tex. 237, 14 S.W.2d 786 (1929).

Hon. Allan Shivers, Page 14 (V-1254)

Legislative Budget Board.[12]

In like vein, the Fifty-second Legislature has appended several similar riders to its general appropriation bill, as follows:

"The Legislative Budget Committee /sic/ is hereby authorized to require quarterly budget approval prior to the expenditure of any of the funds appropriated to the departments and agencies of the State of Texas in this Act. Such requirement when exercised shall be made by filing written notice with the State Comptroller and written direction with the department or agency. After such notice, no moneys herein appropriated shall be expended until such budget approval shall have been secured." Article III, Section 2, subd. (34), H.B. 426, Acts 52nd Leg., 1951.

"BUDGET APPROVAL WHEN REQUIRED. The Legislative Budget Board is hereby authorized to require the submission of a budget for its approval prior to the expenditure of any of the funds appropriated to the State institutions of higher education and to the other educational agencies of the State of Texas named in his /sic/ article. Such requirement, when exercised, shall be made by filing written notice with the State Comptroller and written direction with the institution or agency. After the effective date provided in such notice, no moneys herein appropriated shall be expended until such budget approval shall been /sic/ been secured. The authority granted by this paragraph shall be exercised only in emergencies. The Legislative Budget Board shall determine when such an emergency exists." Article V, Section 16, H.B. 426, Acts 52nd Leg., 1951.

"Quarterly Budgets. The Legislative Budget Board shall require quarterly budget approval prior to the obligation or expenditure of any of the funds appropriated to the Board institutions and the Central Office in this Article. No moneys herein appropriated shall be expended until such budget approval shall have been secured." Article II, Section 14, H.B. 426, Acts 52nd Leg., 1951.

12/ Section 18(b) and (c), House Bill 321, Acts 51st Leg., R.S., 1949, ch. 842, p. 1084.

Since the State departments, institutions of higher education, and other State institutions are not a part of the legislative branch of the State government, these riders, in requiring further itemization of appropriations or approval of the expenditure of appropriated funds by the Legislative Budget Board, violate the constitutional provision prescribing the separation of powers.

The phrase "any power properly attached to either of the others" prompts inquiry as to what powers belong to each branch. "Legislative" means "making, or having the power to make, a law or laws." Webster's New International Dictionary (2d Ed. 1938). This includes making and itemizing appropriations. "The power to itemize appropriations is a legislative power which it may exercise if it sees fit as long as the is in its hands. . . . The legislation is complete when the appropriation is made." People v. Tremaine, 168 N.E. 817 (N.Y. Ct. App. 1929). The money once appropriated, the Legislature is no longer authorized to concern itself with the further segregation and disbursement of the funds, the constitutional inhibition being not only against actual usurpation of the function, but also against one department's setting itself up in a supervisory capacity over the actions of another.[13] Parenthetically, it may be noted here that if the approval of proposed expenditures be considered a legislative function, still such function could not be delegated by the body as a whole to a few of its members.[14]

The legislative function being to make laws, the executive function is to carry them out. Webster's New International Dictionary (2d Ed. 1938), in its definition of "executive," uses the phrases "or carrying into effect" . . . "or secures their due performance." More specifically, the fiscal administration of the affairs of the government has been held to be an executive duty.[15] The above riders thus attempt to vest an executive power in a joint committee of the legislative branch.

Although Texas cases upholding the separation of powers are too numerous to require citation, one example of an unwarranted legislative interference with the executive department is the striking down of Article 803a, V.P.C., which prescribed the

---

13/ Cooley's Constitutional Limitations (8th Ed. 1927) 227.

14/ Ex parte Youngblood, 251 S.W. 509 (Tex. Crim. App. 1923).

15/ In re Opinion of the Justices, 68 Atl. 873 (N.H. Sup. 1907).

color of uniform to be worn by peace officers making arrests for speeding.[16]

Other jurisdictions likewise abound in case authority. The United States Supreme Court struck down an act of the Philippine Legislature, creating a government-owned bank and coal company and vesting the voting power thereof in a committee including the President of the Senate and the Speaker of the House of Representatives, as an attempt to engraft executive duties upon a legislative office and thus usurp the executive power by indirection.[17] Similarly, an act creating a legislative committee on State water rights was held invalid where the court found that the Legislature had not only made a law but made a joint committee its executive agent to carry out the law.[18]

A New York decision exactly in point, concerning an appropriation fettered by a provision that the money appropriated be spent only with approval of two legislative officers, held unconstitutional the provision of State Finance Law, § 139, requiring such approval, the Court of Appeals saying:

> "The Legislature has not only made a law--i.e., an appropriation--but has made two of its members ex officio its executive agents to carry out the law; i.e., to act on the segregation of the appropriation. This is a clear and conspicuous instance of an attempt by the Legislature to confer administrative power upon two of its own members." People v. Tremaine, 168 N.E. 817, 822 (N.Y. Ct. App. 1929).

Attorney General's Opinion No. O-4609 (1942) is also in point. That opinion construes a rural aid appropriation bill (H.B. 284, Acts 47th Leg., R.S., 1941, ch. 549, p. 880). In that statute a joint legislative advisory committee, composed of five Senate members and five House members, was given power to approve numerous transactions, including the receipt of tuition payment and transportation aid by school districts. The Attorney General ruled that only so much of the act as created a joint legislative advisory committee to study school laws as an aid to their recodification was constitutional, whereas the provisions imposing upon said committee of the Legislature the authority to administer the law were unconstitutional.

---

16/ Scoggin v. State, 38 S.W.2d 592 (Tex. Crim. App. 1931).

17/ Springer v. Philippine Islands, 277 U.S. 189, 202 (1927)

18/ Stockman v. Leddy, 55 Colo. 24, 129 Pac. 220 (1912).

Therefore, in so far as the powers and duties of the Legislative Budget Board are extended in House Bill 426 beyond the duties prescribed for that Board in the statute by which it was created, the Legislature has attempted to place upon the Board duties which are in violation of Section 1 of Article II of the Texas Constitution.

House Bill 426 contains a total of 235 riders. Their validity or invalidity can be determined in most instances by applying to each specific rider the general rules herein stated. In some instances, however, the question may be close enough to require additional opinions.

At this time several opinion requests are pending in this office relating to the validity of specific riders which have not been discussed in this opinion. We shall be pleased to furnish you a copy of each additional opinion as it is completed.

## SUMMARY

In so far as Section 35 of Article III of the Texas Constitution is concerned, in addition to appropriating money and stipulating the amount, manner, and purpose of the various items of expenditure to various departments and accounts, a general appropriation bill may contain any provisions or riders which detail, limit, or restrict the use of the funds or otherwise insure that the money is spent for the required activity for which it is therein appropriated, if the provisions or riders are necessarily connected with and incidental to the appropriation and provided they do not conflict with general legislation.

Riders providing for accounting procedures in connection with the funds appropriated, limiting the use of contingent expense appropriations, setting the rates for travel expense to be paid from the funds to State employees, specifying the time of payment of salaries appropriated and prohibiting the use of appropriated funds for the payment of salaries to "any employee who uses alcoholic beverages while on active duty" or who engages in certain political activities are valid in a general appropriation bill because they merely detail, limit, or restrict the use of the funds appropriated or otherwise insure that the money will be used for the purposes intended. They do not

constitute additional subjects of general legislation in violation of Section 35 of Article III of the Texas Constitution.

Riders attempting to fix salaries and fees or transfer funds contrary to general statutes are unconstitutional, because a general appropriation bill cannot amend, modify, or repeal a general law.

A rider providing for the sale of State property is not related or incidental to the appropriation of funds. It is general legislation on a subject other than appropriations and therefore cannot be constitutionally enacted in a general appropriation bill. Sec. 35, Art. III, Const. of Texas; Att'y Gen. Op. 1253 (1951).

The riders in the general appropriation bill which seek to confer upon a joint board composed of members of the Legislature (Legislative Budget Board) authority to require further itemization of appropriated fund or approval of the expenditure thereof violate Section 1 of Article II of the Constitution of Texas, which prohibits the exercise by the legislative branch of powers properly attached to the executive branch.

Yours very truly,

*Price Daniel*

Attorney General

*E. Jacobson*

E. Jacobson

*Florence Baldwin*

Florence Baldwin

*E. Wayne Thode*

E. Wayne Thode

Assistants